COLUMBUS BAR ASSOCIATION *v.* ZAUDERER.

[Cite as *Columbus Bar Assn. v. Zauderer* (1997), 80 Ohio St.3d 435.]

(No. 97–867—Submitted September 10, 1997—Decided December 31, 1997.)

*James K. Hunter III, K. Wallace Neidenthal, Max Kravitz* and *Bruce A. Campbell,* for relator.

*Mark H. Aultman* and *Charles W. Kettlewell,* for respondent.

*Per Curiam.* Respondent entered into contingent fee agreements with his clients which required them to reimburse him for expenses advanced by him in the course of their cases. Such a commitment required that respondent keep an accurate record of such expenses. Respondent not only failed to keep such records, but he also failed to inform his clients that extraordinary general

expenses were being incurred for them and similarly situated clients and that a portion of those expenses would eventually be charged to their accounts.

As early as 1982, respondent knew that he would be handling more than one Dalkon Shield case. Indeed, in that year he placed newspaper advertisements stating that he was "presently representing women on such cases" and was available to handle others on a contingent fee basis. *Disciplinary Counsel v. Zauderer* (1984), 10 Ohio St.3d 44, 45, 10 OBR 308, 461 N.E.2d 883, 884, fn. 1, modified in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio* (1985), 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652. Certainly, by 1985, when A.H. Robins filed its Chapter 11 case, respondent knew he was incurring fees that would have to be spread among many clients. Respondent knew, better than any one of his clients, that upon taking on additional cases after 1981 he was incurring expenses which would benefit all clients. Yet respondent neither took action to categorize these expenses, nor attempted to isolate them from his other overhead expenses.

Until their cases were settled, respondent did not inform either his existing clients or the new clients who entered into his standard contingent fee contract about the general expenses which would eventually be charged against their cases. At that time, with the settlement figure in hand, he sent to the Smiths, and presumably to other clients whose cases were ready for settlement, "settlement sheets" which allocated a portion of the general expenses to their cases. Although testimony at the hearing indicates that respondent or his staff would explain the expense allocation to his clients at settlement time, ask them if they had any objections, and give them the opportunity to have the allocation of general expenses waived, there is no such evidence that such an explanation or option was given to the Smiths. The stipulations indicate merely that respondent mailed the settlement sheets to the Smiths, and after they signed them, the net funds were disbursed to them.

It appears that respondent, while in a position of dominance because he was in control of the settlement funds, attempted a unilateral alteration of the contingent fee contracts with his clients. He allocated to their cases a portion of extraordinary expenses which the clients might not have anticipated, and allocated as well the costs of medical and expert witnesses who, under his contracts, could be employed by respondent only after consultation with the clients. He then put his clients in a "take it or leave it" position unless they questioned the allocation. We doubt that many clients with the opportunity for an immediate payment would challenge their attorney's discretion.

We find that respondent both failed to keep appropriate records and unilaterally altered contracts with his clients. Respondent's rationalization of his actions on the ground that it would have been inconvenient to call three hundred clients

together to discuss an allocation formula, does not excuse either his failure to keep appropriate records of general expenses specifically incurred for his Dalkon Shield cases, or his failure to inform his clients of the extraordinary general expenses which he was and would be incurring and give them an opportunity, at that time, to exercise the option to seek other counsel.

We conclude, as did the board, that respondent's actions violated DR 9-102(B)(3). Respondent is hereby suspended from the practice of law in Ohio for one year with the entire year stayed on the following conditions:

1. Respondent shall not violate any provision of the Code of Professional Responsibility for a period of two years.

2. The allocation of expenses in any class action or multi-district litigation in which the respondent is counsel within the two years shall be preapproved by relator.

3. The respondent shall refund all amounts overcharged to clients as set forth on the list stipulated into evidence before the panel.

4. The respondent shall maintain the escrow account which he has established to be applied to these refunds.

5. The list of clients entitled to a refund shall remain open for one year for any additional claims by clients and such claims shall, after verification by relator, be paid by respondent.

6. Notice of the potential for such refund shall be given to respondent's clients in a reasonable manner to be approved by relator.

7. The names and addresses of the clients to whom reimbursement is made, other than the Smiths, shall remain under seal to be released only to those representatives of respondent, relator, the board and the Ohio Supreme Court as may be necessary and otherwise identified through a numerical system which does not specifically disclose the identity of any client.

8. The costs of monitoring the disbursement of funds and supervision of that process shall be borne by respondent.

Costs taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

F.E. SWEENEY, J., dissents and would publicly reprimand respondent.